UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| SHELLEY CUMELLA, | ) | CIV. 12-5015-JLV |
| | ) | |
| Plaintiff, | ) | ORDER REVERSING |
| | ) | DECISION OF THE |
| vs. | ) | COMMISSIONER AND |
| | ) | REMANDING FOR |
| CAROLYN W. COLVIN, Acting | ) | CALCULATION AND |
| Commissioner, Social Security | ) | AWARD OF BENEFITS |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

**INTRODUCTION**

On November 15, 2009, plaintiff Shelley Cumella applied for disability

insurance benefits ("DIB"). (Administrative Record, pp. 142-44).[1] Plaintiff

alleged a disability onset date of September 25, 2002. Id. After denial of

her application, an Administrative Law Judge ("ALJ") held an evidentiary

hearing on July 6, 2010. Id. at pp. 33-61. On November 22, 2010, the ALJ

concluded Ms. Cumella was not disabled and denied her benefits.[2] Id. at

pp. 17-32). The Appeals Council denied plaintiff's request for review. Id. at

---

[1]The court will cite to information in the administrative record by
"AR, p. ____."

[2]The ALJ found Ms. Cumella met the insured status requirement for
benefits through December 31, 2005. (AR at p. 23).

pp. 1-3.  The decision of the ALJ became the final decision of the

Commissioner.[3]  Id. at p. 1.

Plaintiff timely filed her complaint appealing from the ALJ's decision.

(Docket 1).  Defendant denies plaintiff is entitled to benefits.  (Docket 7).

The court issued a briefing schedule requiring the parties to file a joint

statement of material facts ("JSMF").  (Docket 9).  If there were any disputed

facts, the parties were required to attach a separate joint statement of

disputed facts.  Id.  The parties filed their JSMF.  (Docket 12).  Plaintiff then

filed a motion for an order reversing the decision of the Commissioner.

(Docket 14).  For the reasons stated below, plaintiff's motion to reverse the

Commissioner's decision (Docket 14) is granted.

## FACTUAL AND PROCEDURAL HISTORY

The parties' JSMF (Docket 12) is incorporated by reference.  Further

recitation of salient facts is included in the discussion section of this order.

## STANDARD OF REVIEW

The Commissioner's findings must be upheld if they are supported by

substantial evidence in the record as a whole.  42 U.S.C. § 405(g); Choate v.

---

[3]Carolyn W. Colvin became the Acting Commissioner of Social Security on
February 14, 2013.  Pursuant to Fed. R. Civ. P. 25(d), Ms. Colvin is
automatically substituted for Michael J. Astrue as the defendant in all pending
social security cases.  No further action need be taken to continue this suit by
reason of the last sentence of section 205(g) of the Social Security Act,
42 U.S.C. § 405(g).

Barnhart, 457 F.3d 865, 869 (8th Cir. 2006).  The court reviews the

Commissioner's decision to determine if an error of law was committed.

Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992).

"Substantial evidence is less than a preponderance, but is enough

that a reasonable mind would find it adequate to support the

Commissioner's conclusion."  Cox v. Barnhart, 471 F.3d 902, 906 (8th Cir.

2006) (internal citation and quotation marks omitted).  Substantial evidence

is evidence that a reasonable mind might accept as adequate to support the

Commissioner's decision.  Choate, 457 F.3d at 869 (quoting Ellis v.

Barnhart, 392 F.3d 988, 993 (8th Cir. 2005)).  The review of a decision to

deny disability benefits is "more than an examination of the record for the

existence of substantial evidence in support of the Commissioner's decision

. . . [the court must also] take into account whatever in the record fairly

detracts from that decision."  Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir.

2005) (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)).

It is not the role of the court to re-weigh the evidence and, even if this

court would have decided the case differently, it cannot reverse the

Commissioner's decision if that decision is supported by good reason and is

based on substantial evidence.  Guilliams v. Barnhart, 393 F.3d 798, 801

(8th Cir. 2005).  A reviewing court may not reverse the Commissioner's

decision " 'merely because substantial evidence would have supported an

opposite decision.'" Reed, 399 F.3d at 920 (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)).

## DISCUSSION

"Disability" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment [or combination of impairments] which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

The Social Security Administration established a five-step sequential evaluation process for determining whether an individual is disabled.[4] 20 CFR §§ 404.1520(a)(4). If the ALJ determines a claimant is not disabled at any step of the process, the evaluation does not proceed to the next step as the claimant is not disabled. Id. The five-step sequential evaluation process is:

> (1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform . . . past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the

---

[4]The same five-step analysis determines eligibility for DIB benefits. House v. Astrue, 500 F.3d 741, 742 n. 1 (8th Cir. 2007).

> Commissioner to prove there are other jobs in the national
> economy the claimant can perform.

Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998). The ALJ applied

the five-step sequential evaluation required by the Social Security

Administration regulations. (AR at pp. 20-32).

## STEP ONE

At step one, the ALJ determined Ms. Cumella had not been engaged in

substantial gainful activity since September 25, 2002. Id. at p. 23;

20 CFR §§ 404.1520(b) & 404.1572.

## STEP TWO

At step two, the ALJ must decide whether the claimant has a

medically determinable impairment that is severe or a combination of

impairments that are severe. 20 CFR §§ 404.1520(c). A medically

determinable impairment can only be established by an acceptable medical

source. 20 CFR §§ 404.1513(a). Accepted medical sources include, among

others, licensed physicians. Id.

The regulations describe "severe impairment" in the negative. "An

impairment or combination of impairments is not severe if it does not

significantly limit your physical or mental ability to do basic work activities."

20 CFR § 404.1521(a). Thus, a severe impairment is one which significantly

limits a claimant's physical or mental ability to do basic work activities.

"Basic work activities" are defined to "mean the abilities and aptitudes necessary to do most jobs." Id. at § 404.1521(b). The regulations explain those "abilities and aptitudes" involve:

(1)     Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

(2)     Capacities for seeing, hearing, and speaking;

(3)     Understanding, carrying out, and remembering simple instructions;

(4)     Use of judgment;

(5)     Responding appropriately to supervision, co-workers and usual work situations; and

(6)     Dealing with changes in a routine work setting.

Id.

The ALJ found Ms. Cumella had eight severe impairments.[5] (Docket 12 at ¶ 2.1). Ms. Cumella's severe impairments are:

---

[5]The court directed the parties to provide definitions of medical terms but no definitions were provided. (Docket 9 at ¶ 1(a)). Consequently, the court is compelled to provide its own medical definitions, adopting commonly acknowledged and recognized explanations.

1.      Cervical disc herniation[6] with probable nerve root[7] compression;

2.      Thoracic disc herniation;

3.      Lumbar degenerative joint disease;[8]

4.      Chronic pain syndrome;[9]

---

[6]Herniation is a "[p]rotrusion of an anatomic structure (e.g., intervertebral disk) from its normal anatomic position." <u>Stedman's Medical Dictionary</u> 179890 (27th ed. 2000).

[7]The term "nerve root" is defined as "the portion of the nerve that runs through the bony canal and exits at each vertebral segment of the spinal cord." http://www.spine-health.com/glossary/n/nerve-root.  The term "nerve compression" is defined as "a condition in which pressure is placed on the nerve causing pain, muscle weakness and potentially, nerve damage.  A nerve can become compressed as it passes between tight regions of muscles and tissue or more commonly from spine conditions such as a herniated disc . . . ." http://www.spine-health.com/glossary/n/nerve-compression.  "Evidence of nerve root compression [is] characterized by neuro- anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine) . . . ." 20 CFR Pt. 404, Subpt. P, App. 1 § 1.04.

[8]"Degeneration of the disc tissue makes the disc more susceptible to herniation. . . . Disc degeneration that affects the lumbar spine can cause chronic low back pain . . . or irritation of a spinal nerve to cause pain radiating down the leg . . . ."  http://www.medicinenet.com/degenerative_disc/page2.htm#what_are_the_symptoms_of_degenerative_disc_disease.

[9]"Chronic pain persists over a longer period of time than acute pain and is resistant to most medical treatments.  It can—and often does—cause severe problems for patients.  A person may have two or more co-existing chronic pain conditions.  Such conditions can include chronic fatigue syndrome, endometriosis, fibromyalgia, inflammatory bowel disease, interstitial cystitis, temporomandibular joint dysfunction, and vulvodynia.  It is not known whether these disorders share a common cause." http://www.medicinenet.com/chronic_pain/article.htm#introduction_to_chronic_pain.

5. Chronic headaches;

6. Fibromyalgia;[10]

7. Chronic opioid[11] use; and

8. Depression not otherwise specified.

Id.

Each of the severe impairments have a distinct and different physical and mental impact. In order to put the record in perspective, the court must first provide a medical summary of each severe impairment suffered by Ms. Cumella and then review the evidence.

## 1. Cervical disc herniation

The ALJ found Ms. Cumella suffered a severe impairment as the result of cervical disc herniation with probable nerve root compression. (Docket 12 at ¶ 2.1). The ALJ noted "a history of . . . disc herniation at C6-7

---

[10]Fibromyalgia is "[a] syndrome of chronic pain of musculoskeletal origin but uncertain cause. The American College of Rheumatology has established diagnostic criteria that include pain on both sides of the body, both above and below the waist, as well as in an axial distribution (cervical, thoracic, or lumbar spine or anterior chest). . . ." Stedman's Medical Dictionary 148730 (27th ed. 2000).

[11]The term "opioid" generally "denot[es] synthetic narcotics resembling opiates but increasingly used to refer to both opiates and synthetic narcotics." Stedman's Medical Dictionary 284610 (27th ed. 2000). Ms. Cumella "takes narcotics [methadone and morphine] and muscle relaxants and this seems to dull her thinking." (AR at p. 26). Methadone is a synthetic opiate. http://www.medterms.com/script/main/art.asp?articlekey=11661. Morphine is an opiate. Id. at 10223.

based on an MRI from 1997." (AR at p. 28). A herniated cervical disc will

typically cause the following pain patterns and neurological deficits:

> <u>C6 - C7 (C7 nerve root)</u> - Can cause weakness in the triceps
> (muscles in the back of the upper arm and extending to the
> forearm) and the finger extensor muscles. Numbness and tingling
> along with pain can radiate down the triceps and into the middle
> finger.[12]

"[A]rm pain from a cervical herniated disc results because the

herniated disc material 'pinches' or presses on a cervical nerve, causing

pain to radiate along the nerve pathway down the arm. Along with the arm

pain, numbness and tingling can be present down the arm and into the

fingertips. Muscle weakness may also be present due to a cervical herniated

disc."[13]

## 2.    Thoracic disc herniation

The ALJ concluded Ms. Cumella suffered a severe impairment as a

result of thoracic disc herniation. (Docket 12 at ¶ 2.1). This conclusion is

supported by the MRI of January 8, 2009. (AR at p. 311). "At T6-7, there is

a focal right central disc herniation. Although this does not truly compress

the spinal cord . . . it is impressing on the anterior aspect of the right side of

---

[12]http://www.spine-health.com/conditions/herniated-disc/cervical-herniated-disc-symptoms-and-treatment-options.

[13]http://www.spine-health.com/conditions/herniated-disc/cervical-herniated-disc-symptoms-and-treatment-options.

the cord. . . . Focal right central disc herniation at T6-7 does impress on the anterior aspect of the right side of the spinal cord." Id.

> A herniated thoracic disc may have significant physical impacts:
>
> Pain is the most common symptom of a thoracic herniated disc and may be isolated to the upper back or radiate in a dermatomal (single nerve root) pattern. . . . Radiating pain may be perceived to be in the chest or belly, and this leads to a quite different diagnosis that will need to include an assessment of heart, lung, kidney and gastrointestinal disorders as well as other non-spine musculoskeletal causes. . . . If the disc herniates into the spinal cord area, the thoracic herniated disk may also present with myelopathy (spinal cord dysfunction). This may be evident by sensory disturbances (such as numbness) below the level of compression, difficulty with balance and walking, lower extremity weakness, or bowel or bladder dysfunction.[14]

Ms. Cumella's complaints of "neuropathy, irritable bowel syndrome, restless leg syndrome . . . and weakness in both legs" are consistent with the sensory disturbances expected from a herniated thoracic disc. (AR at p. 25). These potential physical impacts also are consistent with Ms. Cumella's complaint that "a disc in the middle of her back . . . affects her driving." Id. at p. 26.

### 3. Lumbar degenerative joint disease

The ALJ found Ms. Cumella suffered from lumbar degenerative joint disease and this was a severe impairment. (Docket 12 at ¶ 2.1). "Lower back (lumbar spine) osteoarthritis, sometimes called lumbosacral arthritis,

---

[14]http://www.spine-health.com/conditions/herniated-disc/thoracic-disc-herniation-symptoms.

. . . produces stiffness and pain in the lower spine and sacroiliac joint (between the spine and pelvis)."[15]  The general characteristics of lumbar degenerative disc disease include:

> Pain that is centered on the lower back, although it can radiate to the hips and legs;

> Pain that is frequently worse when sitting, when the discs experience a heavier load than when patients are standing, walking or even laying down; [and]

> Pain that is exacerbated by certain movements, particularly bending, twisting or lifting.[16]

### 4.    Chronic pain syndrome

The ALJ found Ms. Cumella suffered a severe impairment of chronic pain syndrome ("CPS").  (Docket 12 at ¶ 2.1).  By itself, CPS can have a significant impact on an individual's lifestyle and work performance. "Chronic pain tends to interfere with the ability to perform activities of daily living and affects the quality of life."[17]  The major effects of CPS "are depressed mood, fatigue, reduced activity and libido, . . . dependent behavior, and disability out of proportion with impairment. . . ."[18]

---

[15]http://www.spine-health.com/conditions/arthritis/osteoarthritis-spine.

[16]http://www.spine-health.com/conditions/degenerative-disc-disease/lumbar-degenerative-disc-disease.

[17]http://www.medicinenet.com/chronic_pain/symptoms.htm.

[18]http://emedicine.medscape.com/article/310834-overview.

"Musculoskeletal disorders associated with chronic pain include the following: . . . [d]isk herniation/facet osteoarthropathy . . . [f]ibromyalgia . . . [m]echanical low back pain . . . [m]uscular strains and sprains . . . ."[19] "Neurologic disorders associated with chronic pain include . . . [c]ervical radiculopathy, [t]horacic outlet syndrome . . . [c]hronic daily headaches, [m]uscle tension headaches, [m]igraine headaches, [t]emporomandibular joint dysfunction . . . [a]typical facial pain . . . ." Id. Urological and gastrointestinal disorders also are frequently associated with CPS. Id. Finally, psychological disorders including depression and sleep disturbances frequently occur with CPS. Id. "Common reactions to chronic pain over time include fear, frustration, anger, depression, and anxiety. These feelings can make it increasingly tough to conquer chronic pain . . . ."[20]

**5.      Chronic headaches**

The ALJ separately identified chronic headaches as one of Ms. Cumella's eight severe impairments. (Docket 12 at ¶ 2.1). He noted Ms.

---

[19]http://emedicine.medscape.com/article/310834-overview#aw2aab6b2b2.

[20]http://www.webmd.com/pain-management/tc/chronic-pain-syndrome-topic-overview.

Cumella claims to suffer from chronic headaches[21] and suffers with
headaches "24/7."  (AR at pp. 25-26).

6.      **Fibromyalgia**

The ALJ found fibromyalgia to be one of Ms. Cumella's severe
impairments.  (Docket 12 at ¶ 2.1).  Fibromyalgia typically involves
characteristics of "chronic pain, stiffness, and tenderness of muscles,
tendons, and joints without detectable inflammation."[22]  It is common for a
"large majority of patients with fibromyalgia" to suffer from "undue fatigue"
and "sleep disorders."  Id.  "Fibromyalgia is considered an arthritis-related
condition.  However, it is not a form of arthritis . . . since it does not cause
inflammation in the joints, muscles, or other tissues or damage them.  But
fibromyalgia can (like arthritis) cause significant pain and fatigue and it can
similarly interfere with a person's ability to carry on daily activities."  Id.
"Mental and/or emotional disturbances occur in over half of people with
fibromyalgia.  These symptoms include poor concentration, forgetfulness,
and memory problems, as well as mood changes, irritability, depression,
and anxiety. . . . Other symptoms of fibromyalgia include migraine and
tension headaches, numbness or tingling of different parts of the body,

_____

[21]A chronic headache is a "condition . . . that lasts 3 months or more."
http://www.medicinenet.com/headache/glossary.htm.

[22]http://www.medicinenet.com/image-collection/fibromyalgia_picture/
picture.htm.

abdominal pain related to irritable bowel syndrome . . . . Any of the above

symptoms can occur intermittently and in different combinations."[23]

## 7. Chronic opioid use

The ALJ found Ms. Cumella was severely impaired by chronic opioid

use. (Docket 12 at ¶ 2.1). The ALJ noted Dr. Repas found Ms. Cumella

"was on chronic opioid therapy . . . [and] that some of [her] symptoms such

as flushing and hypotension[24] could be associated with her opioid use." (AR

at p. 30). "In recent years there has been an increased use of opioids in the

management of non-malignant chronic pain. . . . Common adverse reactions

in patients taking opioids for pain relief include: nausea and vomiting,

drowsiness, itching, dry mouth, miosis, and constipation. . . . Opioids may

increase risk of traffic accidents and accidental falls."

## 8. Depression not otherwise specified

The ALJ found Ms. Cumella's eighth severe impairment to be

"depression–NOS . . . ." (Docket 12 at ¶ 2.1). Depression-NOS references

"depressive disorders that are impairing but do not fit any of the officially

specified diagnoses. . . . [The] diagnosis requires an expenditure of time that

is deemed unreasonable for most primary care physicians. For this reason,

---

[23]http://www.medicinenet.com/fibromyalgia/page2.htm.

[24]Hypotension is another name for low blood pressure and "for many
people . . . cause symptoms of dizziness and fainting." http://www.mayoclinic
.com/health/low-blood-pressure/DS00590.

physicians often use this code as a proxy for a more thorough diagnosis."[25]
"If a patient exhibits the depressive symptoms as the major feature of their
disorder, but does not meet the criteria for any other mood disorder or any
other mental disorder, then the depressive disorder, NOS is used."[26]  "NOS
[is] a mental disorder described by an all-encompassing low mood
accompanied by low self-esteem, and loss of interest or pleasure in normally
enjoyable activities. . . . [Persons] with NOS have some symptoms [of] poor
concentration and memory, withdrawal from social situations and activities,
reduced sex drive, and thoughts of death or suicide, insomnia, loss of sleep,
loss of appetite, fatigue, headaches and digestive problems."[27]

**<u>STEP THREE</u>**

At step three, the ALJ determines whether claimant's impairment or
combination of impairments meets or medically equals the criteria of an
impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 ("Appendix
1").  20 CFR §§ 404.1520(d), 404.1525, and 404.1526.  If a claimant's
impairment or combination of impairments meets or medically equals the
criteria for one of the impairments listed and meets the duration
 requirement of 20 CFR § 404.1509, the claimant is considered disabled.

---

[25]http://en.wikipedia.org/wiki/Depressive_Disorder_Not_Otherwise_
Specified.

[26]http://www.depression-guide.com/depressive-disorder-nos.htm.

[27]Id.

The ALJ determined Ms. Cumella did not have an impairment or combination of impairments which met or were medically equal to one of the impairments listed in Appendix 1. (AR at p. 24). To arrive at this conclusion, the ALJ rejected the opinion of Dr. Frost, Ms. Cumella's treating physician and a pain specialist. Instead, the ALJ adopted the opinions of Drs. Pelc, Soule, and Gunn, consulting psychologists, and Drs. Whittle and Entwistle, consulting physicians. (AR at pp. 24 & 29). Ms. Cumella objects to the ALJ's conclusion as an error of law. (Docket 14 at p. 3). "The ALJ rejects treating physician Dr. Steven Frost who has seen, examined and treated Ms. Cumella over 35 separate visits over the course of the last 15+ years." Id. at p. 5. "Dr. Frost's Medical Source Statement and the limitations outlined therein, are remarkably consistent with the limitations documented by Dr. Craig Mills, a board certified physiatrist and rehab specialist hired by the Social Security Administration to do a comprehensive consultative exam on Ms. Cumella." Id. at p. 4. "Both Dr. Frost, the long-standing treating physician, and Dr. Mills, the specialist who saw Claimant at the request of DDS, found that Claimant as a result of her pain and medical limitations would not be able to complete an eight hour day." Id. at p. 8. "Dr. Frost's and Dr. Mills' opinions are well supported by objective medical tests and are consistent with the other evidence of record and should have been given controlling weight." Id. at p. 9.

16

"A treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." House v. Astrue, 500 F.3d 741, 744 (8th Cir. 2007) (citation and internal quotation marks omitted). However, "while entitled to special weight, it does not automatically control, particularly if the treating physician evidence is itself inconsistent." Id. (citations and internal quotation marks omitted). If the treating physician's opinion is not given controlling weight under 20 CFR §§ 404.1527(d)(2) and 416.927(d)(2), it must be weighed considering the factors in 20 CFR §§ 404.1527(d)(2)-(6) and 416.927(d)(2)-(6). See Shontos v. Barnhart, 328 F.3d 418, 426 (8th Cir. 2003) ("Where controlling weight is not given to a treating source's opinion, it is weighed according to the factors enumerated . . . ."). The ALJ must "give good reasons for discounting a treating physician's opinion." Dolph v. Barnhart, 308 F.3d 876, 878-79 (8th Cir. 2002). The court must "defer to an ALJ's credibility finding[s] as long as the ALJ . . . gives a good reason [for those findings]." Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (internal citation and quotation marks omitted).

For the reasons stated below, the ALJ's decision to reject the opinions of Dr. Frost and Dr. Mills was not supported by good reason and was not

based on substantial evidence.  Guilliams, 393 F.3d at 801; Dolph, 308 F.3d at 878-79; and Schultz, 479 F.3d at 983.

The ALJ rejected Dr. Frost's opinions with the following explanation: "The undersigned declines to give this opinion controlling weight for it is inconsistent with other evidence in the record, including the medical opinions given greater weight, and it is not well supported by objective medical findings."  (AR at p. 27).  "Dr. Frost's opinion is not supported by medical findings in his clinical records . . . or the findings of the claimant's other treating and examining medical sources."  Id. at p. 28.

The ALJ made the following observations about Dr. Frost's medical opinions:

> Treating physician Dr. Steve Frost completed a medical source statement on May 29, 2010 in which he opined the claimant can perform less-than-sedentary work, and not work even 8 hours per day.  He opined the claimant was not a good candidate for an employer secondary to her pain . . . . The undersigned declines to give this opinion controlling weight for it is inconsistent with other evidence in the record, including the medical opinions given greater weight, and it is not well supported by objective medical findings.
>
> The limitations given by Dr. Frost are afforded less weight. He opined the claimant cannot travel without a companion for assistance. This is in apparent contradiction to the claimant's testimony at hearing that she sometimes drives, and in a written statement that she is able to go out alone.  The doctor stated he has treated the claimant for 11 years and her condition has progressively worsened . . . . This appears to contradict the claimant's testimony that her condition has remained the same since 2003. The doctor opined the claimant is unable to concentrate for any period of time (measured in minutes), secondary to pain . . . . The undersigned notes this sort of

18

limitation was not apparent during the hearing—which lasted about 40 minutes—during which time the claimant had no evident problems testifying and responding appropriately to questions.

Dr. Frost's opinion is not supported by medical findings in his clinical records . . . or the findings of the claimant's other treating and examining medical sources. For example, when he referred the claimant to Dr. Repas in February, 2009, Dr. Frost made the statement that the claimant functions on her medication, which included narcotic medication—but that she had had complaints that were not adequately diagnosed and could not be directly attributed to the side effects of the medication . . . . This statement appears to be inconsistent with the extreme limitations given later by Dr. Frost which he mostly attributed to the claimant's back impairments—impairments that were established long before he referred the claimant to Dr. Repas . . . .

Id. at pp. 27-28. The ALJ concluded Dr. Frost's examination in April of 2003 was inconsistent with Dr. MacLachlan's examination just two months earlier. Id. at p. 28. That conclusion is inconsistent with the entirety of the relevant portions of Dr. Frost's April 2003, report.

The patient has had a complete workup both neurologically and with her primary care [Dr. Elston] with no significant etiology for these new sensations of pain and numbness. She almost has a fibromyalgic-type pattern although patients with fibromyalgia do not typically complain of numbness in the extremities or severe electric shock pain; therefore, I am going to have to treat the patient as a patient with fibromyalgia and neuropathic pain with an unclear etiology.

She has no change in the location. It is throughout the entire body. The quality is electric. The intensity can go from 4/10 to 10/10. The duration is chronic. . . .

There are multiple tender points throughout the upper thoracic area, even across the medial epicondyles bilaterally in the elbow region.

Id. at p. 305; see also Docket 12 at ¶ 3.7.

The ALJ's conclusion regarding Dr. MacLachlan's cervical finding is simply wrong. The ALJ failed to note Dr. MacLachlan made two distinct observations on February 12, 2003.[28] Dr. MacLachlan reviewed two separate MRIs and noted Ms. Cumella suffered left paracentral cervial disc herniation at C6-7 (1997) and right paracentral thoracic disc herniation at T6-7 (2003). (AR at p. 303; see also AR at p. 311). "Cervical MRI scan performed in 9-4-97, demonstrates a left paracentral disk herniation at C6-7 level and a thoracic MRI study performed on 1-8-03. This demonstrates a right parcentral disk herniation at 6-7 level." Id. at p. 303. While Dr. MacLachlan found Ms. Cumella to have full range of cervical motion, he reported "the patient has had chronic headaches for a number of years which may be cervicogenic[29] in origin. I am unable to explain the patient's migratory paresthesias and lower extremity pain. . . . It is doubtful that the

---

[28]The ALJ erroneously reports Dr. MacLachelan's report as February 2, 2003. (AR at p. 28).

[29]"Cervicogenic headache is a syndrome characterized by chronic hemicranial pain that is referred to the head from either bony structures or soft tissues of the neck." Cevicogenic Headache: A Review of Diagnostic and Treatment Strategies, David M. Biondi, DO, J. Am. Osteopath Association, April 1, 2005, vol. 105 no. 4 (Abstract). "Cervicogenic headache can be a perplexing pain disorder that is refractory to treatment if it is not recognized. . . . the pain is likely referred from one or more muscular, neurogenic, osseous, articular, or vascular structures in the neck." Id.

patient's thoracic disk herniation is responsible for her migratory dysesthesias[30] and lower extremity pain." Id.

In addition, the ALJ emphasized that Dr. MacLachlan's examination of Ms. Cumella on February 12, 2003, was "claimant described her general health as good, with no significant changes." (AR at p. 28). This statement in Dr. MacLachlan's report is taken out of context. In the ROS (review of systems) portion of the report, Dr. MacLachlan notes Ms. Cumella's "[g]eneral health has been good with no significant changes noted." (AR at p. 301). But other sections of the ROS report "**[p]ositive for headaches** . . . **[p]ositive for joint swelling and stiffness** . . . ." Id. (emphasis in orginal). On that date, Ms. Cumella was taking "Zoloft, Naproxen, methadone . . . [and] ibuprofen p.r.n." Id. at p. 300.

The ALJ also wrote Dr. MacLachlan's report noted "[n]o abnormalities were found from an examination of the lumbar and thoracic spines." Id. at p. 28. The ALJ left out Dr. MacLachlan's report that "[p]alpation of the

---

[30]Dysesthesias refer to "[a]bnormal sensations on the skin, such as a feeling of numbness, thingling, prickling, or a burning or cutting pain." Taber's Cyclopedic Medical Dictionary at p. 587 (18th ed.).

cervical spine revealed palpable tenderness over the right nuchal[31] insertion

site." Id. at p. 302.

While Dr. Frost's finding of thoracic tenderness is inconsistent with

Dr. MacLachlan's one-day finding, this minor variance in patient

responsiveness on a given day is not inconsistent with the doctors' ultimate

conclusions.  Those diagnoses are summarized:

> Dr. MacLachlan - chronic daily tension headaches (which may be cervicogenic headaches), migratory dysesthesias and lower extremity pain.

> Dr. Frost - myofascial neck pain, occipital tension headache, fibromyalgia-type pattern with neuropathic pain.

Id. at pp. 303 & 305.

The ALJ adopted Dr. Entwistle's opinions over the opinions of Dr.

Frost.

> Dr. Frederick Entwistle . . . opined the claimant can perform a limited range of sedentary exertional work . . . .[32] This opinion is given greatest weight . . . . Dr. Entwistle's opinion is most consistent with the overall weight of the evidence, and it is well supported by his narrative discussion.  He noted evidence the claimant underwent an orthopedic examination on October 18, 2005, which revealed multiple medical concerns evaluated

---

[31]The "nuchal ligament . . . is a fibrous membrane, which, in the neck, represents the supraspinal ligaments of the upper vertebrae. . . . It extends from the external occipital protuberance and median nuchal line to the spinous process of the seventh cervical vertebra."  http://en.wikipedia.org/wiki/Nuchal_ligament.

[32]"Dr. Frederick Entwistle . . . reviewed the evidence of record through April 2, 2009 . . . ."  (AR at p. 27).

> extensively over the years but with no clear explanation for the
> claimant's symptoms . . . . He noted evidence that the claimant
> had not appeared for a scheduled EMG (electromyography, or
> nerve conduction study) . . . . The doctor noted that he gave
> consideration to the claimant's subjective reports of pain in his
> assessment, and opined she should be able to alternate positions
> from sitting, standing, or walking . . . . He noted his impression
> that the claimant's symptoms were of greater severity than would
> normally be expected from her medically determinable
> impairments. He opined she was not completely credible . . . .

Id. at p. 27; see also Docket 12 at ¶ 3.36. Dr. Entwistle's Physical Residual

Functional Capacity Assessment identified Ms. Cumella's primary diagnosis

as "Fibromyalgia/Chronic Pain Syndrome" and a secondary diagnosis of

"DDD" [degenerative disc disease]. (AR at p. 269). Dr. Entwistle's

assessment makes no mention of the other five severe physical impairments

endorsed by the ALJ's decision. For whatever reason, the ALJ chose not to

mention in his comparative analysis of credibility the results of a number of

MRIs which Dr. Entwistle failed to explain and which contradicted Dr.

Entwistle's ultimate assessment:

1.    "MRI of the cervical on 9/4/97 showed perhaps a
      very small central disk protrusion C7-T1"[33] versus
      "[c]ervical MRI on 2/16/07 revealed right sided disc
      herniation at C5-6 with compression of the right
      side of the cord and probable impingement of the
      right C6 nerve root."[34]

---

[33]AR at p. 271.

[34]AR at p. 276.

2.  "MRI of the thoracic on 1/8/03 noted right central herniation at T6-7 but doesn't compress the spinal cord"[35] <u>versus</u> "MRIs in file of thoracic on 1/8/03 revealed right central herniation at T6-7 which does impress on the anterior aspect of the right side of the spinal cord."[36]

3.  "MRI of the lumbar on 1/8/03 was normal"[37] <u>versus</u> "MRI of the lumbar on 2/16/07 revealed minor DDD and facet joint degenerative disease."[38]

With Dr. Entwistle's contradictory statements, it is unclear whether the doctor's statement "[t]he severity of the symptoms is greater than would ordinarily be expected on the basis of claimant's impairment" (AR at p. 274) is based on his first interpretations expressed at page 271 of the administrative record, or his second, more severe interpretations expressed at page 276.

Finally, Dr. Entwistle's opinions were accepted by the ALJ even though the doctor stated there were no medical source conclusions about Ms. Cumella's limitations which were significantly different from his opinions. <u>Id.</u> at p. 275. Dr. Entwistle's declaration is inconsistent with the findings of Drs. Frost, Mills, and MacLachlan, as well as the ALJ's medical-

---

[35]AR at p. 271.

[36]AR at p. 276.

[37]AR at p. 271.

[38]AR at p. 276.

legal findings Ms. Cumella suffered a total of seven severe physical

impairments.

The ALJ also adopted Dr. Whittle's opinions over the opinions of Dr.

Frost.  The ALJ reported Dr. Whittle's opinions as follows:

> Dr. Kevin Whittle . . . concurred with the limitations given by Dr.
> Entwistle.[39]  Dr. Whittle noted his impression that the claimant's
> symptoms appeared to be out of proportion to the objective
> medical findings although depression might be contributing to her
> symptoms.   He noted evidence of a physical examination that
> showed some decreased range of motion in the cervical spine, but
> no inflammatory arthritis. He noted MRIs of the spine to show
> degenerative changes but no nerve root compression. . . .

Id. at p. 27.  The ALJ gave "great weight" to the opinions of Dr. Whittle as

being "consistent with the overall evidence of record[,]" even though the

doctor failed to acknowledge the existence of "probable cervical nerve root

compression[.]"  Id.  As discussed above, the MRI studies did more than

"show some degenerative changes," they disclosed herniation with

compression–a separate, distinct, and significant impairment of the cervical

and thoracic spine.  Id.

It is inappropriate for the ALJ to make a substantive medical finding

Ms. Cumella suffers a severe impairment of "cervical disc herniation with

. . . probable nerve root compression," but then accept the reports of those

---

[39]"Dr. Kevin Whittle . . . reviewed the evidence or record through July 29,
2009 . . . ."  (AR at p. 27).

physicians who reported no "significant medical findings in the cervical area

. . . ." Id. at p. 27. "The opinion of a consulting physician who examines a

claimant once or not at all does not generally constitute substantial

evidence." Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998). In this

case, the reviews conducted by the consulting physicians are not supported

by the objective medical evidence. These consulting experts failed to find

Ms. Cumella suffered from not two or three severe impairments, but seven

severe physical impairments.

The consulting physicians did not have access to the entire record.

Dr. Entwistle examined the record through April 2, 2009, and Dr. Whittle

examined the record through July 29, 2009. (AR at p. 27). Yet, Dr. Frost's

final report was made on May 29, 2010. Id. at pp. 620-26. This report was

based on his work with Ms. Cumella for over 11 years. Consulting

physicians, who did not examine the claimant, should be given less weight

especially if those sources "did not have access to relevant medical records,

including relevant medical records made after the date of evaluation."

McCoy v. Astrue, 648 F.3d 605, 616 (8th Cir. 2011) (citing Wildman v.

Astrue, 596 F.3d 959, 968 (8th Cir. 2010)).

The ALJ also seems to reject Dr. Frost's opinions because "[t]he record

does not contain evidence of both a sitting and supine positive straight leg

raise test." (AR at p. 24). This statement comes from Appendix 1.

26

"Examination of the spine should include a detailed description of gait, range of motion of the spine given quantitatively in degrees from the vertical position (zero degrees) or, for straight-leg raising from the sitting and supine position (zero degrees), any other appropriate tension signs, motor and sensory abnormalities, muscle spasm, when present, and deep tendon reflexes."  Appendix 1 at 1.00(E)(1).

Dr. Craig Mills, a rehabilitation specialist, retained by the South Dakota Department of Disability Determination Services, did a detailed physical examination of Ms. Cumella for disability evaluation purposes.  (AR at p. 29).  Dr. Mills' examination contains a sitting straight leg raising maneuver, together with a number of other flexion and extension maneuvers.  The ALJ recited only a portion of the examination performed by Dr. Mills on March 9, 2009.  Id. at p. 29.  Dr. Mills' physical examination found:

> She has restricted range of motion in the cervical spine where she has had imaging studies demonstrating herniated discs to the left. She is able to the left rotate 40° to the right . . . 20°.  Cervical flexion is fair at 35°.  Extension is limited to 20°.  She is able to perform good shoulder range of motion in the elbow and wrist. Apley scratch maneuver for shoulder extension and internal rotation is T9 on the right, T10 on the left.  Reflexes are 1+ for biceps, triceps, brachial radialis and same for knee jerk and ankle jerk 1+ and symmetric in the lower limbs.  She does have some evidence of osteoarthritic change at the MCP, PIP, and DIP joints that is somewhat scattered and appears to be more osteoarthritic.

She has fair grasp at present. She has negative Tinel's[40] Phalen's.[41] She has negative pain at the extensor forearm and at medial knee and costochondral areas anterior chest wall. Significant soft tissue pain of areas at posterior occipital, right more than left and trapezius levator scapular areas, tenderness at glutcal and greater trochanter areas. She has tenderness and pain over the mid thoracic intrascapular area above the bra line, as well as in the lumbosacral area. In a seated position, straight leg raise is negative, but has pain at full extension with ankle dorsiflexion performed. Patrick's maneuver[42] is negative. She is able to stand and arise with shoes with heel on and ambulate. She has limited lumbar flexion to 60° with tightness in pain and back being more mid thoracic and low back. No substantial tremors are observed at this time with her noting this fluctuates.

Id. at p. 489; see also Docket 12 at ¶¶ 3.32-3.35. This evaluation complied with the examination of the spine contemplated by Appendix 1, 1.00(E)(1). No treating or consulting physician challenged Dr. Mills' opinions because of the absence of a supine leg raising test. Discounting Dr. Mills' opinions on this basis is without merit. Dismissing Dr. Mills' examination and opinions because of the absence in the record of a particular test which the ALJ thought should be performed is wrong.

_____

[40]"Tinel's sign is a way to detect irritated nerves. It is performed by lightly tapping (percussing) over the nerve to elicit a sensation of tingling or 'pins and needles' in the distribution of the nerve." http://en.wikipedia.org/wiki/Tinel_sign.

[41]"Phalen's maneuver is a diagnostic test for carpal tunnel syndrome." http://en.wikipedia.org/wiki/Phalen_maneuver.

[42]"Patrick's test or FABER test (for Flexion, Abduction and External Rotation) is performed to evaluate pathology of the hip joint or the sacroiliac joint." http://en.wikipedia.org/wiki/Patrick's_test.

The ALJ also declined to give any weight to Dr. Mills' opinions because the doctor expressed the "opinion that the claimant cannot work 8 hours per day, 5 days per week goes to the issue under consideration in this decision, and it is a matter reserved to the Commissioner . . . ." (AR at p. 29) (citations omitted). "A medical source opinion that an applicant is 'disabled' or 'unable to work,' . . . involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." Ellis, 392 F.3d at 994. While the ALJ is entitled to disregard Dr. Mills' opinion which invades the ultimate authority of the Commissioner, that does not mean the ALJ is entitled to reject the remaining medical opinions of the doctor.

Dr. Mills' "unable to work" opinion is "only one part of a larger medical record supplied [by the physician] and [the claimant's] other treating physicians." Brown v. Astrue, 611 F.3d 941, 952 (8th Cir. 2010) (citing Cox v. Barnhart, 345 F.3d 606, 609 (8th Cir. 2003). "Viewed in context of her medical record, [the physician's] letter is a culmination of the numerous visits [the claimant] had with her past doctors, and his experience with treating her chronic pain." Id. (citing Cox, 345 F.3d at 609). The "larger medical record" supports Dr. Mills' medical opinions relating to Ms. Cumella's chronic pain and physical limitations. Id. at 953.

The ALJ rejected Dr. Frost's and Dr. Mills' opinions regarding Ms. Cumella's restricted range of motion of her lower back. (AR at pp. 28-29). The ALJ also ignored Dr. MacLachlan's inability to explain Ms. Cumella's "migratory dysesthesias and lower extremity pain." Id. at p. 28. Rather than adopting the findings and opinions of a pain specialist and a rehabilitative specialist, the ALJ accepted the general finding of Dr. Repas, an endocrinologist, regarding her range of motion on one particular day. Id. at p. 29.

Additionally, the ALJ gave the "greatest weight to the testimony of Dr. Pelc [a consulting psychologist] regarding the claimant's mental impairment and these are reflected in the residual functional capacity shown above." (AR at p. 30). The ALJ cannot discount the opinions of Dr. Frost or Dr. Mills based on Dr. Pelc's pychological evaluation. Dr. Pelc only addressed Ms. Cumella's mental impairment, her depression. "I am just evaluating her psychological status." Id. at p. 41; see also id. at p. 630.

The length of Dr. Frost's treating relationship and the frequency of his examinations of Ms. Cumella are factors to consider when determining the weight to give a treating physician's opinion. 20 CFR § 416.927(d)(2)(i). Dr. Frost's opinions are consistent with his own notes and are consistent with the other medical and non-medical sources providing counseling and therapy to Ms. Cumella. 20 CFR § 416.927(a)-(f).

The ALJ erred, both factually and as a matter of law, when he chose to give substantial weight to the opinions of the consulting physicians. The Commissioner's findings on this issue are not supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); Choate, 457 F.3d at 869. Dr. Frost's opinions are entitled to controlling weight. House, 500 F.3d at 744; see also Medhaug v. Astrue, 578 F.3d 805 (8th Cir. 2009). "[A] treating physician's opinion is given controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." Id. at 815 (quoting Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (internal quotation marks omitted).

Having concluded Dr. Frost's opinions are entitled to controlling weight, it is necessary at step three of the analysis to determine whether Ms. Cumella had "an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 . . . ." ("the criteria") (AR at p. 24) (emphasis deleted). In addressing the criteria, the ALJ stated "[t]he claimant[43] has specifically considered the listings at 1.02, 1.04, 11.00, 12.04, and 12.09 and finds these are not met or equaled." Id.

---

[43]This is a typographical error as the ALJ certainly meant "the undersigned" or "the ALJ."

Listing 1.02 focuses on "[m]ajor dysfunction of a joint(s) (due to any cause)[.]" Appendix 1 at 1.02. Dr. Frost does not identify any joint dysfunction which qualifies under listing 1.02 of the criteria. Listing 1.04 focuses on "[d]isorders of the spine (e.g., herniated nucleus pulposus,[44] spinal arachnoiditis,[45] spinal stenosis,[46] osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture)[.]" Id. at 104. These spinal disorders must "result[] in compromise of a nerve root . . . or the spinal cord. With:

    A.    Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

    or

---

[44]"Herniated nucleus pulposus" is more commonly known as a herniated disc. "A herniated (slipped) disk occurs when all or part of a disk in the spine is forced through a weakened part of the disk." http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001478.

[45]"Spinal arachnoiditis" is "a chronic pain disorder caused by the inflammation of the arachnoid membrane and subarachnoid space that surround the nerves of the spinal cord." http://www.spine-health.com/glossary/a/arachnoiditis.

[46]"Spinal stenosis is narrowing of the spinal column that causes pressure on the spinal cord, or narrowing of the openings . . . where spinal nerves leave the spinal column." http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001477.

B.     Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

or

C.     Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively . . . ."

Id. Both Dr. Frost's reports and the MRIs show "[e]vidence of nerve root compression" at C6-7 and T6-7 with "neuro-anatomic distribution of pain . . . accompanied by sensory or reflex loss[.]"

Listing 11.00 of the criteria focuses on specific neurological disorders. Id. The administrative record does not identify any of those disorders. Listing 12.04 of the criteria focuses on affective disorders, including depression, and listing 12.09 addresses substance addiction disorders. Id. "The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied." Id. at 12.02. To qualify as disabled under criteria B of 12.04, the claimant must have results in at least two of the identified areas:

1.     Marked restriction of activities of daily living; or

2.     Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration[.]

Id. Ms. Cumella's degree of limitation based upon her depression are:

restriction of activities of daily living—mild;

difficulties in maintaining social functioning—mild;

deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner—moderate; [and]

episodes of decompensation each of extended duration—none.

(AR at 24). Ms. Cumella does not qualify under criteria B and thus does not qualify under either listing 12.04 or 12.09.

The court finds under listing 1.04 Ms. Cumella's severe impairments of cervical disc herniation and thoracic disc herniation meet or medically equal the impairment required by Appendix 1. Ms. Cumella is disabled.

**STEP FOUR**[47]

Before considering step four of the evaluation process, the ALJ is required to determine a claimant's residual functional capacity ("RFC"). 20 CFR §§ 404.1520(e) and 416.920(e). RFC is a claimant's ability to do physical and mental work activities on a sustained basis despite any

---

[47]Because there may be a challenge to the court's finding of Ms. Cumella being disabled at step three, the court will continue the review of the ALJ's decision.

limitations from her impairments.  20 CFR §§ 404.1545(a)(1) and

416.945(a).  In making this finding, the ALJ must consider all of the

claimant's impairments, including those which are not severe.  20 CFR

§§ 404.1545(e) and 416.945(e).  All of the relevant medical and non-medical

evidence in the record must be considered.  20 CFR §§ 404.1520(e),

404.1545, 416.920(e), and 416.945.

"The ALJ should determine a claimant's RFC based on all the relevant

evidence, including the medical records, observations of treating physicians

and others, and an individual's own description of [her] limitations."

Lacroix v. Barnhart, 465 F.3d 881, 887 (8th Cir. 2006) (quoting Strongson v.

Barnhart, 361 F.3d 1066, 1070 (8th Cir. 2004)); see also Cox, 495 F.3d at

619 (because RFC is a medical question, the ALJ's decision must be

supported by some medical evidence of a claimant's ability to function in the

workplace, but the ALJ may consider non-medical evidence as well);

Guilliams, 393 F.3d at 803 ("RFC is a medical question, and an ALJ's

finding must be supported by some medical evidence.").  The ALJ "still

'bears the primary responsibility for assessing a claimant's residual

functional capacity based on all relevant evidence.' " Id. (quoting Roberts v.

Apfel, 222 F.3d 466, 469 (8th Cir. 2000)).

"In determining RFC, the ALJ must consider the effects of the

combination of both physical and mental impairments."  Stormo v.

Barnhart, 377 F.3d 801, 807 (8th Cir. 2004) (citing Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir. 2003)).  As stated earlier in this discussion, a severe impairment is one which significantly limits an individual's physical or mental ability to do basic work activities.  20 CFR § 404.1521(a).

The ALJ concluded there was no evidence that Ms. Cumella's impairments, either individually or in combination, "equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix I . . . ."  (AR at 24).  But the ALJ did not address how the combination of physical and mental impairments affected the determination of RFC.

After finding fibromyalgia to be one of Ms. Cumella's severe impairments, the ALJ is required to take fibromyalgia into consideration when determining her RFC.  See Pirtle v. Astrue, 479 F.3d 931 at 935 (8th Cir. 2007).  The ALJ failed to do so.

"Fibromyalgia is an elusive diagnosis; '[i]ts cause or causes are unknown, there's no cure, and of greatest importance to disability law, its symptoms are entirely subjective.' "  Tilley v. Astrue, 580 F.3d 675, 681 (8th Cir. 2009) (quoting Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996)).  Because of this, it is inevitable a physician would rely on the subjective statements of a patient when making a fibromyalgia diagnosis.

In Brosnahan v. Barnhart, 336 F.3d 671 (8th Cir. 2003), the United States Court of Appeals for the Eighth Circuit held that an ALJ improperly

determined a claimant suffering from fibromyalgia was less than credible when he based his determination on the claimant's activities of daily living and degree of treatment. "[W]e have held, in the context of a fibromyalgia case, that the ability to engage in activities such as cooking, cleaning, and hobbies, does not constitute substantial evidence of the ability to engage in substantial gainful activity." Id. at 677 (citing Kelley, 133 F.3d at 588-89. A number of treatment options for fibromyalgia, including exercise, are recognized.[48] Id. at 672, n. 1 (the American College of Rheumatology indicates that treatment for fibromyalgia "include[s] cold and heat application, massage, exercise, trigger-point injections, proper rest and diet, and medications such as muscle relaxants, antidepressants, and anti-inflammatories.").

The ALJ criticized Ms. Cumella for engaging in any form of exercise or self-help therapy. "On January 27, 2004, the claimant reported . . . she was bicycling 30 minutes per day . . . . This evidence appears to be inconsistent with the claimant's testimony and statements regarding her limitations." (AR at 28) (internal citation omitted). Yet, exercise is encouraged for individuals suffering from fibromyalgia or CPS. "Because there is a known link between many types of chronic pain and tense, weak muscles,

_____

[48]"Low-impact aerobic exercises, such as swimming, cycling, walking, and stationary cross-country ski machines, can be effective fibromyalgia treatments." http://www.medicinenet.com/fibromyalgia/page4.htm.

exercise—even light to moderate exercise such as walking or swimming—can contribute to an overall sense of well-being by improving blood and oxygen flow to muscles. Just as we know that stress contributes to pain . . . exercise, sleep, and relaxation can all help reduce stress, thereby helping to alleviate pain."[49] The ALJ did not ask Ms. Cumella about the nature of her bicycling, her exercise exertion level, or any post-exercise consequences, i.e., pain or discomfort.

The ALJ discounted Ms. Cumella's credibility because . . . . "[h]er alleged limitations are not supported by objective medical findings." (AR at 30). "Certainly the claimant's medically determinable impairments, including her chronic pain syndrome and fibromyalgia, have resulted in some limitation of function—but not to the extent asserted by the claimant. Her reported limitations are not supported by the medical opinions given great weight." Id.

The ALJ adopted Dr. Entwistle's summary of Ms. Cumella's activities of daily living:

> [Ms. Cumella] noted being up most night and sleeping only a couple of hours, otherwise propped up on pillows to relieve pain. Good days noted as few. Has chronic insomnia and excruciating pain. Stays in pajamas most days and if she needs help dressing, her husband helps her. She is able to make simple meals. Can't stand for long over stove. She only makes a few meals a week and no other household chores. . . . Can only lift a couple of pounds,

---

[49]http://www.medicinenet.com/chronic_pain/page4.htm.

walks short distances, can't sit up in a chair for more than a half hour to an hour without having to lie down, stand for more than a half hour. . . . Has pain with reaching. . . . It appears that [Ms. Cumella] does a lot of self limiting within her daily function and doesn't seem completely credible. . . .

(AR at p. 274). In light of this assessment, the ALJ found Ms. Cumella's description of her lifestyle activities not "completely credible" even though the ALJ concluded "[a] written statement from the claimant's husband . . . generally corroborates the claimant's statements regarding her limitations." Id. at p. 26. Mr. Cumella's statement provides a detailed and lengthy description of the limitations on his wife's activities of daily living, including but not limited to helping her get dressed and undressed, how he must do the vast majority of the household chores, grocery shopping and cooking, and how he needs to carry her from room-to-room when her pain is at an extreme level. Id. at pp. 231-239; see also Docket 12 at ¶¶ 5.6-5.9.

The ALJ also concluded Ms. Cumella was less than credible because she "appears to have exaggerated her complaints. She testified she spends 90% of her day (i.e., more than 21 hours) in bed but there is no evidence in the record of bedsores or muscular atrophy as might be reasonably expected in someone who spends most of her day in bed." (AR at p. 30). The ALJ took Ms. Cumella's testimony out of context. At the administrative hearing Ms. Cumella did testify she spend about 90 percent of her day in bed. Id. at p. 44. But she then described what she meant by that statement:

It just depends upon the day. . . . I am a chronic insomniac. I generally start my day around 1:00 in the afternoon. I will get up on a good day and I can load the dishwasher. I go back and rest. After a while I get up and I can throw a load of clothes in the wash. Do minor things around the house, but still with the middle of my back, it affects my breathing, so I need to prop myself up with pillows and, so that is why I have to take the rest. The bad days, I don't move.

Id. at pp. 44-45. She further described her "bad days":

I prop myself up. Just like I am sitting here. I prop up my mid back and then usually I have to get my legs propped up under a pillow. So, I spend most of my time, my room is set up just like that. . . . in bed.

Id. at pp. 48-49. This explanation of Ms. Cumella's activities is consistent with her descriptions to Dr. Frost and Dr. Mills. Neither physician nor the consulting physicians questioned her explanation because of the absence of bedsores. The ALJ is not permitted to make what is in essence a negative diagnosis from Ms. Cumella's testimony. The ALJ may not "substitute his opinion for medical evidence . . . and an ALJ's finding must be supported by some medical evidence." Guilliams, 393 F.3d at 803. There is no evidence in this record to support the ALJ's conclusion on this matter.

The ALJ criticized Ms. Cumella's conduct during the hearing as being inconsistent with her statements or the statements of the physicians. "The [ALJ] notes this sort of limitation was not apparent during the hearing—which lasted about 40 minutes—during which time the claimant had no evident problems testifying and responding appropriately to

40

questions." (AR at 28).  This conclusion ignored Ms. Cumella's testimony that she was in pain as she sat through the hearing.  Id. at 51.  She testified she could sit comfortably for about 20-30 minutes after which she was in pain.  Id.  As she sat through the hearing she was in pain.  Id.

The ALJ noted Ms. Cumella took anti-depression medications, but did not make a finding her severe depression was "well controlled by drugs . . . ."  Martinez v. Astrue, 630 F.3d 693, 697 (7th Cir. 2011).  The ALJ found there was "no evidence of any psychiatric hospitalization or treatment by any mental health specialists" yet declined to accept the finding of "[e]xamining psychologist Dr. Dewey Ertz, on March 2, 2009."  (AR at p. 31). The ALJ acknowledged Dr. Ertz's global assessment of functioning ("GAF") for Ms. Cumella "at 45[50] . . . [to] represent[] serious limitations of function" but then criticized Dr. Ertz for not specifically identifying which functional limitations existed.  Id.  Yet, after completing a "mental status examination, and administer[ing] memory testing . . . . Dr. Ertz observed that Cumella's 'mental status was remarkable for difficulties concentrating and focusing her attention with physical pain, reports of anxiety and depression and an observed depressed/anxious mood.' "  (Docket 12 at ¶¶ 3.27 & 3.30)

_____

[50]"A GAF score between 41 and 50 indicates '[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  (Docket 12 at ¶ 3.31 n. 2) (citing the American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, "Axis V: Global Assessment of Functioning at *34).

(emphasis added).  Dr. Ertz's psychological conclusions are consistent with the records of Drs. Frost and Mills.  His conclusions also are consistent with the severe impairments developed in the record and found to exist.  The ALJ erred, both as a matter of fact and a matter of law, in rejecting the opinions of Dr. Ertz.

Ms. Cumella's "ability to engage in some life activities, despite the pain it caused her, does not mean she retained the ability to work . . . ." Tilley, 580 F.3d at 681.  "[I]n the context of a fibromyalgia case, . . . the ability to engage in activities such as cooking, cleaning, and hobbies, does not constitute substantial evidence of the ability to engage in substantial gainful activity."  Brosnahan, 336 F.3d at 677.

Ms. Cumella's testimony is supported by the objective medical evidence of all seven severe physical impairments.  Her "testimony and reports to the SSA are supported by objective medical evidence of fibromyalgia . . . and by her consistent complaints during her relatively frequent physicians' visits of variable and unpredictable pain, stiffness, fatigue, and ability to function."  Id. at 678.  It is incorrect for the ALJ to conclude Ms. Cumella's hearing testimony that her physical limitations have not changed since 2003 "seems inconsistent . . . ."  (AR at p. 28).  Ms. Cumella's statements reflect her "attempt to describe the variability of her symptoms."  Brosnahan, 336 F.3d at 677.  Dr. Frost's and Dr. Mills'

diagnoses of fibromyalgia, chronic pain, disc herniation, and degenerative

disc disease, all of which were adopted by the ALJ, "bolster[] the credibility

of [Ms. Cumella's] complaints." Green-Younger v. Barnhart, 335 F.3d 99,

108 (2d Cir. 2003). The ALJ erred, both as a matter of fact and a matter of

law, in his evaluation of the testimony of Ms. Cumella.

The ALJ failed to give proper consideration not only to Ms. Cumella's

diagnosis of fibromyalgia and CPS, but to the other five severe physical

impairments and her severe mental impairment. "In determining RFC, the

ALJ must consider the effects of the combination of both physical and

mental impairments." Stormo, 377 F.3d at 807.

Dr. Frost's description of Ms. Cumella's physical limitations for

arriving at a RFC are summarized:

- lift or carry 10 pounds occasionally;

- at one time without interruption she can sit for 15 minutes, stand for 15 minutes, and walk for 20 minutes;

- in total in an eight hour day she can sit, stand, or walk for one hour;

- never reach with either hand either overhead or otherwise;

- with either hand occasionally engage in handling, fingering, feeling, and push/pull activities;

- with either foot occasionally operate foot controls;

- occasionally climb stairs and ramps, operate a motor vehicle;

- never climb ladders or scaffolds, balance, stoop, kneel, crouch or crawl or be exposed to unprotected heights or vibrations;

- she can tolerate noise only at the level of quiet (a library);

- perform activities like shopping, ambulate without assistance, use public transportation, climb a few steps with the assistance of a handrail, prepare a simple meal and feed herself; perform personal hygiene activities and can sort, handle, and use papers or files; and

- not travel without a companion for assistance and is not able to walk a block at a reasonable pace over rough or uneven surfaces.

(AR at pp. 620-25). Dr. Frost determined these limitations have lasted or will last for 12 consecutive months. Id. He also stated these limitations "were present [in the] 2002-2003 period." Id. at 625.

Because Dr. Frost's opinion is entitled to controlling weight, the ALJ's RFC, which did not incorporate Dr. Frost's opinions, is not supported by substantial evidence. Ms. Cumella satisfied the burden of persuasion to demonstrate her RFC. Stormo, 377 F.3d at 806.

## STEP FIVE

The "burden of production shifts to the Commissioner at step five." Id. Gerry Gravad, a vocational specialist, testified at the administrative hearing. (AR at 57). Mr. Gravad concluded if the limitations reported by Dr. Frost are applied, that individual could not perform any jobs. Id. at 59; see also Docket 12 at ¶ 71.

The court may affirm, modify, or reverse the Commissioner's decision, with or without remand to the Commissioner for a rehearing. 42 U.S.C. § 409(g). If the court determines that the "record overwhelmingly supports a disability finding and remand would merely delay the receipt of benefits to which the plaintiff is entitled, reversal is appropriate." Thompson v. Sullivan, 957 F.2d 611, 614 (8th Cir. 1992). Remand to the Commissioner is neither necessary nor appropriate in this case. The Commissioner's own final witness resolves this case in favor of Ms. Cumella. Ms. Cumella is disabled and entitled to benefits. Reversal is the appropriate remedy at this juncture. Thompson, supra.

## ORDER

In accord with the above decision, it is hereby

ORDERED that plaintiff's motion (Docket 14) is granted and the decision of the Commissioner of November 22, 2010, is reversed and the case is remanded to the Commissioner for the purpose of calculating and awarding benefits to the plaintiff Shelley Cumella.

Dated March 26, 2013.

BY THE COURT:

/s/ *Jeffrey L. Viken*
JEFFREY L. VIKEN
CHIEF JUDGE